[990 NYS2d 208]

In the Matter of OLUKAYODE L. BABALOLA (Admitted as OLUKAYODE LAWRENCE BABALOLA), an Attorney, Respondent. DEPARTMENTAL DISCIPLINARY COMMITTEE FOR THE FIRST JUDICIAL DEPARTMENT, Petitioner.

First Department, July 31, 2014

**APPEARANCES OF COUNSEL**

*Jorge Dopico, Chief Counsel, Departmental Disciplinary Committee*, New York City (*Kevin P. Culley* of counsel), for petitioner.

*Olukayode L. Babalola*, respondent pro se.

### OPINION OF THE COURT

Per Curiam.

Respondent Olukayode L. Babalola was admitted to the practice of law in the State of New York by the First Judicial Department on January 10, 1995, under the name Olukayode Lawrence Babalola. At all times relevant herein, respondent maintained an office for the practice of law within the First Department.

The Departmental Disciplinary Committee seeks an order pursuant to Rules of the Appellate Division, First Department (22 NYCRR) § 603.4 (e) (1) (iii), immediately suspending respondent from the practice of law until further order of this Court based upon uncontested evidence that respondent repeatedly misappropriated and converted client funds. Respondent opposes the Committee's motion.

The Committee has charged respondent with, inter alia, misappropriation and/or conversion of client funds. Respondent filed an answer denying all charges. The Court has appointed a Referee to conduct a hearing on the underlying charges. In the course of proceeding the Committee has obtained information, including bank records and testimony during respondent's deposition which support respondent's immediate suspension from the practice of law, pending further court order.

In October 2011, the Committee received a complaint from M.M. alleging that respondent had neglected an estate matter and misappropriated funds to which his children, P.P.M. and N.P.M., were entitled; respondent submitted an answer denying the allegations of misconduct.

M.M. explained that in April 2005, P.P.M. and N.P.M.'s mother passed away. In August 2005, respondent was retained to probate the estate and handle related legal matters, which included the collection of life insurance proceeds and death benefits. According to bank records, as of October 2005, respondent held $207,176.08 in life insurance and death benefits in his IOLA account on behalf of the M. family. Between October 2005 and December 2006, respondent disbursed $89,462.69 of said funds on behalf of the M. family to pay the mortgage on the residence they inherited from their late mother, N.P.M.'s school tuition, and other living expenses. After the $89,462.69 in disbursements, respondent's IOLA account should have had a minimum balance of $117,713.39. However, as of December 27, 2006, the IOLA account balance was only $73,798.88.

In or about December 2006 respondent discussed with the M. family several investment opportunities for the funds remaining in his IOLA account. Thus, an investment agreement was executed on December 28, 2006, between respondent and the M. family which authorized respondent to invest $130,000 of their funds in "real estate ventures and other forms of investments." Under the terms of the agreement, respondent was "permitted and instructed to open a separate account with Washington Mutual Bank under the name Greater Works Realty to secure part or all of the funds and disburse as appropriate." Greater Works Realty was an entity solely owned and controlled by respondent. The agreement specified that respondent was not acting as their attorney, but rather as a "broker and promoter" for which he was to be "remunerated as agreed." On December 27, 2006, just one day prior to the investment agreement, respondent's IOLA account balance was only $73,798.88. Although by December 29, the account balance increased to $118,798.88, it did so via a $45,000 deposit from an unknown source. Respondent claimed to have an additional $12,500 in cash in his safe, which was not corroborated by any reliable documentary evidence. Nevertheless, respondent never deposited the $130,000 into Greater Works Realty's account, or any other account pursuant to the investment agreement.

During his July 11, 2013 deposition before the Committee respondent claimed to have invested $55,000 of the $130,000 in real estate ventures. Specifically, respondent testified that he disbursed $10,000 to 1139 Clay Avenue Associates LLC (1139 Clay) on December 29, 2006 and $45,000 to a person, A.V., on January 4, 1997. The Committee notes that these "investment loans" are evinced by promissory notes in which respondent, not the M. family, is listed as payee. Further, respondent's IOLA account records do not document a specific disbursement of $10,000 to 1139 Clay, or anyone else, during the relevant period. While an IOLA check for $45,000 was issued to A.V. on or about January 4, 2007, it immediately followed the $45,000 deposit, on or about December 29, 2006, from an unknown source.

The Committee emphasizes that, even if respondent's testimony regarding the $55,000 investment were to be credited, the balance respondent was required to maintain in escrow on the M. family's behalf as of July 31, 2007 fell short by $49,603.98 ($104,605.38 [should have remained in account belonging to the M. family] less $1.40 [the balance in the IOLA account as of July 31, 2007] less $55,000).

Additionally, between June 2006 and July 2007, respondent issued 48 IOLA checks payable to himself in varying amounts totaling $122,240, which the Committee alleges were for his own personal purposes. During his July 2013 deposition, respondent testified that he cashed the aforementioned checks, held the cash in a safe deposit box in his office, and later disbursed the funds as the M. family requested. Respondent conceded, however, that he did not maintain any detailed records which would show the exact amounts and specific dates of the various cash payments he made to the M. family. Rather, respondent submitted a nonitemized summary showing the yearly totals of escrow funds he purportedly disbursed on behalf of the M. family between 2005 and 2011.

The M. family alleged, however, that respondent routinely failed to provide them with requested funds which resulted in, among other things, their utilities being cut off and the loss of their late mother's home to foreclosure.

In addition to the 48 IOLA checks payable to himself, respondent, from June 2006 to July 2007, issued IOLA checks and authorized debits to third parties, which the Committee alleges were for his own benefit. These included: 14 payments, totaling $6,564, to Verizon and Sprint PCS, ostensibly for respondent's mobile telephone and Internet service; $1,257.08 to Con Edison to pay for his office electric service; $1,000 to the African Abroad Newspaper for a six-month color advertisement; and a debit of $1,200 to the Long Island Power Authority (LIPA), presumably for service to his home in Westbury, New York.

In response to the M. family's repeated demands for the return of their invested funds, in October 2009, respondent entered into two agreements in which he acknowledged that the M. family was entitled to $73,000 and agreed to repay same in periodic installments. In March 2011, respondent executed an amended repayment schedule but he has not made payments in accordance with these agreements.

In opposition to the Committee's motion, respondent, pro se, emphasizes that he was not acting as an attorney in connection with the funds he held and disbursed under the investment agreement. Respondent argues that the agreement did not mandate that he deposit the $130,000 in Greater Works Realty's account, rather it "permitted" such. Respondent did not transfer the funds at issue to his company's account because: (1) the funds were fully disbursed by way of investment and payments to the M. family; and (2) in his view, commingling the

M. family's funds with Greater Works Realty's funds could have led to competing claims of ownership.

In addition, respondent takes issue with the Committee's accounting. Respondent argues that he preserved the $130,000 prior to entering into the investment agreement with the M. family as evinced by the fact that, as of December 31, 2006, a few days after the agreement, his IOLA account balance was $118,798.88, in addition to which he held $12,500 in cash. Notably, however, respondent's account balance only increased to $118,798.88 following the previously discussed $45,000 deposit from an unknown source on December 29, 2006; prior to which the balance was only $73,798.88.

Respondent claims that he fully and properly disbursed the $130,000 by loaning $55,000 at 5% cumulative interest and withdrawing the balance of $75,000, which he held and disbursed over time to the M. family or on their behalf. Respondent argues that the Committee failed to account for this $75,000. As previously noted, respondent has not provided an itemized accounting as to cash disbursed to, or on behalf of, the M. family.

Respondent concedes that, to date, he owes the M. family $46,697.26 for repayment of the loaned funds but explains that: (1) due to serious health problems he has been hampered in his pursuit of payment from the borrowers; and (2) his failure to fully repay the sum due under his two agreements with the M. family is attributable to N.P.M.'s insistence on receiving a full, lump sum payment rather than more manageable periodic installments.

Respondent is not clear in addressing the issue of the 48 IOLA checks totaling $122,240 he issued to himself. He argues that: (1) the total sum of the checks establishes that he had in excess of $75,000 in his IOLA account; and (2) "most" of the checks have notations on the memo lines indicating that the funds were taken out on behalf of other clients. In fact, a significant number of checks contain no notation whatsoever. Moreover, respondent claims that some of the checks were for legal fees due him from other client matters, however, he provides no specifics.

As to the IOLA checks and debits issued to third parties such as Verizon and LIPA, respondent concedes that these disbursements had nothing to do with the M. family but "may have been made to meet the legitimate interests of other clients other than the [M. family]."

In reply, the Committee, inter alia, again emphasizes that prior to issuing the purported loans under the investment agreement, respondent's IOLA account balance should have been at least $117,713.39, however, as of December 27, 2006, it was only $73,798.88. Furthermore, even if this Court were to credit respondent's claim that he was holding $12,500 in cash on behalf of the M. family at the time, there would still be a deficiency.

22 NYCRR 603.4 (e) (1) (iii) provides, in pertinent part:

> "[a]n attorney who is the subject of an investigation . . . by the Departmental Disciplinary Committee of professional misconduct . . . may be suspended from the practice of law, pending consideration of the charges against the attorney, upon a finding that the attorney is guilty of professional misconduct immediately threatening the public interest. Such a finding shall be based upon:

> "(iii) other uncontested evidence of professional misconduct."

The committee has met its burden. Respondent's IOLA account bank records establish uncontested evidence of professional misconduct under 22 NYCRR 603.4 (e) (1) (iii) in that respondent either intentionally converted and/or misappropriated IOLA funds belonging to the M. family (*see Matter of Harris*, 97 AD3d 96 [1st Dept 2012]; *Matter of Kennedy*, 87 AD3d 107 [1st Dept 2011]; *Matter of Zuber*, 71 AD3d 170 [1st Dept 2010]; *Matter of Jobi*, 56 AD3d 158 [1st Dept 2008]; *Matter of Szaro*, 10 AD3d 81 [1st Dept 2004]; *Matter of Gallancy*, 219 AD2d 298 [1st Dept 1996]; *Matter of Quesada*, 182 AD2d 145 [1st Dept 1992]).

Accordingly, the Committee's motion is granted and respondent is suspended from the practice of law, pursuant to 22 NYCRR 603.4 (e) (1) (iii), effective immediately, and until further order of this Court.

TOM, J.P., FRIEDMAN, RENWICK, GISCHE and CLARK, JJ., concur.

Respondent suspended from the practice of law in the State of New York, effective the date hereof, until such time as disciplinary proceedings pending before the Committee have been concluded, and until further order of this Court.